# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
COOK, HAIGHT, and WEIS
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private First Class KAMARQUES K. DYESS**
**United States Army, Appellant**

ARMY 20120486

Headquarters, 82d Airborne Division
Tara A. Osborn, Military Judge (arraignment)
James L. Pohl, Military Judge (trial)
Lieutenant Colonel Paul J. Cucuzzella, Staff Judge Advocate

For Appellant: Captain Aaron R. Inkenbrandt, JA; William E. Cassara, Esquire (on brief).

For Appellee: Colonel John P. Carrell, JA; Major Daniel D. Derner, JA; Captain Daniel H. Karna, JA (on brief).

16 June 2015

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

HAIGHT, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of attempted larceny, attempted robbery, conspiracy to commit larceny, conspiracy to commit robbery, conspiracy to commit burglary, false official statement, and burglary, in violation of Articles 80, 81, 107, and 129, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 880, 881, 907, 929 (2006).[1] The military judge sentenced appellant to a bad-conduct discharge, four years of

---

[1] The military judge acquitted appellant of violating a lawful general regulation by wrongfully ingesting "Spice," conspiracy to commit aggravated assault with a loaded firearm, aggravated assault by intentional infliction of grievous bodily harm, and aggravated assault with a loaded firearm.

confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved only so much of the adjudged sentence as provides for a bad-conduct discharge, confinement for three years and nine months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority also credited appellant with fourteen days of confinement.

Appellant's case is now pending review before this court pursuant to Article 66, UCMJ. Appellant raises five assignments of error, four of which merit discussion and three of which merit relief. A recitation of the background facts is unavoidable. Although an extensive narration of the chain of events is unnecessary to resolve the three assignments of error for which relief is being granted, a more thorough recitation of the underlying facts is beneficial in light of appellant's assertion that his convictions for all offenses are factually and legally insufficient.

## BACKGROUND

The evidence and testimony presented at trial reveal the following occurred on the night in question.

### a. House Robbery

Appellant's case stems from the collective actions of a group of soldiers assigned to the 82d Airborne Division at Fort Bragg, North Carolina. On an evening in late January of 2011, Private First Class (PFC) Bryan Alston hatched a plot with two other soldiers, PFC Shelton Hunt and Private (PVT) Cordric Coleman, to burglarize a house in the nearby town of Spring Lake. Specifically, while PFC Hunt and PVT Coleman were "playing video games and watching movies" in PFC Hunt's barracks room, PFC Alston stopped by and proposed that they rob "a house with a lot of drugs and money." Private First Class Alston then departed to further coordinate with another soldier, PFC Cerion Allen, who was responsible for identifying the "target" house.

In the meantime, PFC Hunt and PVT Coleman decided it would be prudent to secure a firearm for their night of crime "for protection and if [the victims] did not want to give [the drugs and money] up, [to] make them give it up." Another soldier, Private Christopher Jackson, agreed to lend them his Springfield .45 XD semiautomatic pistol for the evening. However, PVT Jackson did not have the weapon with him; it had been left in a vehicle belonging to Specialist (SPC) Jones, PFC Hunt's roommate. While waiting to hear further word from PFC Alston, PFC Hunt and PVT Coleman smoked Spice and took Percocet pills, and at some point, PVT Coleman called appellant in an effort to contact PFC Alston because "Private Alston did not have a phone and he [would] usually be with [appellant]." Private Coleman and PFC Hunt then changed into dark clothing and waited for PFC Alston, who returned a short time later.

2

Private First Class Alston led PVT Coleman and PFC Hunt to appellant's barracks room where they were joined by appellant and PFC Allen. Private Coleman testified that once in appellant's room, appellant provided the group of soldiers with gloves and other articles of clothing to "cover our face[s]" because "we did not want anyone to recognize us." Next, the soldiers returned to the topic of PVT Jackson's pistol, which was coincidentally located at a trailer park in Spring Lake near the house they intended to rob. All five soldiers piled into appellant's Chevrolet Impala and appellant drove them to Spring Lake to retrieve the weapon. Upon their arrival at the trailer park, PFC Hunt got out of appellant's car and, along with SPC Jones' girlfriend and another female, searched through SPC Jones' vehicle and located PVT Jackson's pistol.[2] Private First Class Hunt returned to appellant's car with the loaded pistol, and the soldiers passed the weapon around among themselves as appellant drove to their next destination. Then, following directions from PFC Allen, appellant drove the group to the target home.

In planning the robbery, each of the five soldiers had been assigned a role. Specifically, appellant was going to be the "driver" and would stay in his vehicle as a "lookout" while the other soldiers kicked in the door and executed the robbery. Accordingly, appellant drove toward the "residential area" where the target home was located and parked in an adjacent "dark area by some woods by a tree." However, shortly after some of the conspirators approached the house, the soldiers adjusted their plan because the initially intended entry point was too well lit. So, they returned to appellant's car and had him drive to a different location—a nearby abandoned house—so they could re-approach from the back of the house.

Appellant parked and the other four soldiers exited his vehicle and climbed over a fence into the backyard of their target. In his role as the lookout, appellant used a cell phone to communicate with PVT Coleman and PFC Hunt to warn them to "[h]old on" because there was a pedestrian in the area. Private Coleman testified that after approximately five minutes, appellant informed the group that "the coast was clear." Private Coleman, PFC Hunt, PFC Allen, and PFC Alston then broke into the home, with PFC Hunt kicking in the back door and PVT Coleman entering first with the pistol. After the four soldiers "cleared the house" and concluded that no one was home, they began scouring the house for drugs and money. However, twenty minutes of searching "under beds, under mattresses, [and in] cabinets [and] dressers" yielded nothing of consequence, and PVT Coleman called appellant and asked him to pick them up in front of the house.

*b. Drive-By Shooting*

Once the soldiers returned to appellant's car, PVT Coleman looked at his cell phone and discovered that PVT Jackson had been attempting to contact him to no

---

[2] The record does not reveal where SPC Jones was at this point.

avail because the calls had been placed while "we were in the house searching for drugs and money." With the unfruitful burglary behind them, PVT Coleman called PVT Jackson back but there was no answer. Instead, PVT Jackson sent PVT Coleman a text message asking if he still had the pistol. Private Coleman responded that he did indeed have PVT Jackson's weapon, and PVT Jackson replied that he needed it back because "some guy bumped into him and disrespected him." Private Coleman explained that he understood PVT Jackson wanted his pistol back to "assault the guy who bumped into him. . . . Shoot him or whatever." Private Jackson then called PVT Coleman and told him he was at a club called Speakeasy. After that call, PVT Coleman shared PVT Jackson's text messages with PFC Hunt, and PFC Hunt told appellant to drive to Speakeasy.

Private Coleman testified that he "wiped down the gun" on the drive to Speakeasy because if PVT Jackson was "going to use it, I did not want my prints on it." Private Coleman then passed the weapon to PFC Hunt, and upon their arrival at Speakeasy, PVT Jackson met them at appellant's vehicle and retrieved his pistol from PFC Hunt. Next, PVT Jackson gave a more detailed account of the altercation in which he had been involved at the club and according to PVT Coleman, PVT Jackson explained that "he was going to handle the situation."

Ultimately, two vehicles—one with PVT Jackson and some cohorts and the Impala, still being driven by appellant and full of the original conspirators— followed a Mercury Mountaineer, a vehicle containing the soldiers whom PVT Jackson was stalking. Both of the following vehicles caught up with the Mountaineer at a red light shortly after re-entering Fort Bragg. Then, PVT Jackson, from the vehicle in which he was riding, rapidly fired multiple gunshots into the driver's side of the Mountaineer. After the shooting and during the subsequent flight from that scene, PFC Alston called his friends in the other vehicle and all agreed to meet at another nearby club. When appellant arrived there, all eight soldiers exited their respective vehicles and began discussing what had transpired. Private Coleman testified that PVT Jackson declared, "that is how gangstas do it."

Approximately four days later, appellant was interviewed by a Criminal Investigation Command agent concerning the drive-by shooting. In a sworn statement, appellant admitted that on the night in question, he did in fact go to Speakeasy. But, he lied about what he did at that club's parking lot and with whom he spoke at that time.

For his involvement in the aforementioned events, appellant was charged with and convicted of: (1) attempted larceny of drugs and money; (2) attempted robbery of drugs and money: (3) conspiracy to commit larceny; (4) conspiracy to commit robbery; (5) conspiracy to commit burglary; (6) false official statement; and (7) burglary.

**LAW AND DISCUSSION**

*1. Conspiracy to Commit Multiple Crimes*

Appellant alleges, "[t]he military judge erred in not combining the three conspiracy charges in Specifications 1, 2, and 3 of Charge II for findings." In its response, the government concedes that "appellant formed only one conspiracy . . . and does not oppose appellant's proposed remedy of consolidating the [conspiracy] specifications." *See Braverman v. United States*, 317 U.S. 49, 53 (1942) ("[O]ne agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one."); *United States v. Pereira*, 53 M.J. 183, 184 (C.A.A.F. 2000) (holding a single agreement to commit multiple offenses ordinarily constitutes a single conspiracy). We agree with and accept the government's concession and will consolidate. Moreover, when merging the conspiracies, we will do so in light of the fact that one of the objects of the agreement, that of larceny, is a lesser-included offense of another object of that same agreement, that of robbery. *See Manual for Courts-Martial, United States* (2008 ed.), pt. IV, ¶ 3.b.(1)(a) (explaining that larceny is a lesser included offense of robbery); *see also United States v. Cunningham*, 6 U.S.C.M.A. 106, 107, 19 C.M.R. 232, 233 (1955).

*2. Attempted Larceny and Attempted Robbery*

Recognizing, as just stated, that larceny is a lesser-included offense of robbery, appellant alleges that the attempted larceny specification is multiplicious with the attempted robbery specification and should be dismissed. *United States v. Palagar*, 56 M.J. 294, 296 (C.A.A.F. 2002). Again, the government concedes the error, and we again agree with and accept the government' concession and will set aside the finding of guilty to attempted larceny and dismiss that specification.

*3. Unreasonable Multiplication of Charges*

Based on the errors noted above and the relief contemplated, appellant would remain convicted of attempted robbery, a single conspiracy to commit burglary and robbery, false official statement, and burglary. Appellant alleges the attempt specification is an unreasonable multiplication of charges. We agree.

Specifically, we find the misconduct that constituted appellant's "substantial step" towards robbery is the same misconduct addressed by the allegation that appellant did, "in the nighttime, unlawfully break and enter the dwelling house of another, with intent to commit robbery with a firearm therein." *United States v. Byrd*, 24 M.J. 286, 290 (C.M.A. 1987); *see also United States v. Schell*, 72 M.J. 339 (C.A.A.F. 2013); *United States v. Redlinski*, 58 M.J. 117 (C.A.A.F. 2003).

Therefore, although not multiplicious, the attempted robbery specification and the burglary specification are aimed at the same acts, namely, the formulation of the criminal plan and intent to rob, the preparation for and subsequent execution of that plan, and the ultimate commission of the crime of burglary upon breaking and entering the target house with full intent that their previously taken steps would come to criminal fruition. The only reason the robbery was not perfected was because there happened to be nobody home upon which to inflict the intended force or violence.

Thus, as the government concedes, "it most likely cannot be said that the attempt charge and the burglary charge were 'aimed at distinctly criminal acts.'" *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). Accordingly, we will set aside the finding of guilty to attempted robbery and dismiss that specification. *See United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012) (noting one or more factors may be sufficiently compelling, without more, to warrant relief).

## CONCLUSION

The findings of guilty to Specifications 1 and 2 of Charge I and Charge I are set aside and that charge and its specifications are DISMISSED. Specification 1 of Charge II is set aside and that specification is DISMISSED. Specifications 2 and 3 of Charge II are consolidated to allege the following conspiracy specification:

> Charge II: Violation of the UCMJ, Article 81.
>
> In that Private First Class Kamarques K. Dyess, U.S. Army, did, at or near Fort Bragg, North Carolina, on or about 30 January 2011, conspire with Private (E1) Cordric L. Coleman, Private First Class Shelton A. Hunt, Private (E1) Bryan C. N. Alston, and Private First Class Cerion R. Allen to commit offenses under the Uniform Code of Military Justice, to wit: robbery with a firearm and burglary, and in order to effect the objects of the conspiracy the said Private First Class Kamarques K. Dyess did travel to the dwelling house of another.

The findings of guilty to Charge II and Specification 2 (consolidated) and the remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the errors noted and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

DYESS—ARMY 20120486

In evaluating the *Winckelmann* factors, we find no dramatic change in the penalty landscape or exposure which might cause us pause in reassessing appellant's sentence. The military judge merged the attempt offenses for sentencing purposes. Similarly, the military judge also merged the conspiracy offenses for sentencing. Second, the gravamen of appellant's misconduct remains the same. Third, appellant was sentenced by a military judge alone, and finally, based on our experience, we are familiar with the remaining offenses so that we may reliably determine what sentence would have been imposed at trial.

After reassessing the sentence and the entire record, the sentence is AFFIRMED. We find this reassessed sentence is not only purged of any error but is also appropriate. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored.

Senior Judge COOK and Judge WEIS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

7